UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

Ultrapak, LLC and Khalid M. Khan,

                              Plaintiffs,

      v.

Laninver USA, Inc., Enric Holzbacher, and
Alain Zijlstra,

                              Defendants.

**Decision and Order
and
Report and Recommendation**

18-CV-561V

## I.   INTRODUCTION

Plaintiff Ultrapak LLC is a corporate entity that was created in 2015 and that formed its governing agreement on January 13, 2016. Defendant Laninver USA, Inc. owns 51 percent of Ultrapak. Plaintiff Khalid Khan owns the other 49 percent. Ultrapak has a Board of Directors comprising three people: Khan; defendant Enric Holzbacher, who is Laninver's CEO; and defendant Alain Zijlstra, who is the CEO of Laninver's parent company. Ultrapak corporate counsel Jason Schmidt has been the corporate counsel since Khan was the sole owner of Ultrapak's predecessor entity. From his history with Ultrapak, Schmidt almost certainly was involved in some way in whatever conversations and negotiations led to the creation of the January 13, 2016 governing agreement.

Schmidt also is the sole counsel for plaintiffs here and the attorney who drafted the complaint (Dkt. No. 1) and put this case in suit. In light of the preceding paragraph, Schmidt's role as prosecuting attorney poses a problem. Schmidt put this case in suit because Ultrapak and Laninver are in the middle of a contract dispute. As the current complaint is structured, this case has split Ultrapak at two levels: A company is suing its majority owner; and one Director of that same company is suing the other two Directors. At the center of these two splits is the company's

own corporate counsel, Schmidt.  Defendants see a conflict of interest and have filed a non-dispositive[1] motion (Dkt. No. 9) to disqualify Schmidt from representing plaintiffs in the litigation.  The parties have traded arguments as to whether a conflict exists, including arguments as to whether Schmidt needed authority from the Board of Directors to litigate on behalf of Ultrapak.

District Judge Lawrence J. Vilardo has referred this case to this Court under 28 U.S.C. § 636(b).  (Dkt. No. 11.)  The Court has deemed the pending motions submitted on papers under Rule 78(b) of the Federal Rules of Civil Procedure.  For the reasons below, the Court grants the motion.

## II. BACKGROUND

While the pending motion focuses more narrowly on attorney disqualification, the broader case concerns a contract dispute over the quality of shrink sleeve product packaging.  The complaint offers a good summary of Ultrapak's history:

> Plaintiff Ultrapak, LLC ("Ultrapak") is a New York limited liability company engaged in business as a producer of shrink sleeve product packaging in the North American shrink sleeve and flexible packaging industry, with its production plant and principal place of business located in the City of Dunkirk, State of New York.  Ultrapak was formed on September 2, 2015, as a successor to the business operated under the "Ultrapak" tradename since 1992, in the same North American shrink sleeve market, by Shaant Industries, Inc., itself a New York corporation headquartered in the same location.  Incorporated in 1987, Shaant Industries, Inc., engaged in the same business of supplying shrink sleeves directly under its own label from 1987 through 1992, and under the Ultrapak label since.

(Dkt. No. 1 at 1.)  The complaint offers also a brief description of the corporate relationships that surround Laninver; some familiarity with these relationships will help place the attorney disqualification issue in context:

---

[1] "Motions for disqualification of counsel are non-dispositive and are thus subject to the more deferential standard under Rule 72(a)."  *Donatello v. Cty. of Niagara*, No. 15-CV-39A, 2015 WL 8328845, at *1 n.1 (W.D.N.Y. Dec. 7, 2015) (internal quotation marks and citation omitted).

> At all relevant times, Laninver is a holding company with no business operations of its own, wholly owned by Laninver S.H.C. S.L. based in Madrid, Spain, which, in turn, is wholly owned by Grupo Lantero, an international company also headquartered in Madrid, which is a prominent player in the global packaging industry, including multiple European and North and South American markets, with controlling ownership interests in multiple product line group companies.
>
> As it is relevant to this action, one of Grupo Lantero's holdings consist of "Emsur," itself a parent company and/or group of business entities with 10 production plants dedicated to the manufacture of flexible containers primarily for packaging food and dairy products in countries spanning the Americas, Europe, Africa, the Middle East and Asia.
>
> Among other subsidiary companies and businesses, Emsur serves as the parent entity for Emsur USA LLC ("Emsur USA"), a Delaware limited liability company formed on December 16, 2013, and thereafter qualified to do business in the State of Illinois where it maintains its principal place of business at 2800 Carl Boulevard in Elk Grove Village, the same business location as defendant Laninver.
>
> Defendant Laninver is the manager of Emsur USA.
>
> Emsur also serves as the parent entity of other related subsidiaries, including, but not limited to, business entities commonly referred to within the Grupo Lantero family of businesses as "Emsur Mexico," "Emsur Spain" and "Emsur Poland," their respective official names and entity statuses not currently known. At all relevant times, Emsur's plants in the United States, Mexico, Spain and Poland produce printed flexible packaging.

(*Id.* at 3.)

According to the complaint, the events that led to the current litigation began with a merger proposal. Around 2012, Emsur approached Khan about adding Ultrapak to its family of packaging companies. Discussions and negotiations ensued over the next few years. The parties eventually crystallized their negotiations into the January 13, 2016 governing agreement. (Dkt. No. 10-2.) Under the agreement, Laninver acquired a 51 percent interest in Ultrapak, leaving Khan with the remaining 49 percent. Section 5.1 of the agreement created a Board of Directors that had "the full and complete power, authority and discretion to do all things and on such terms as it determines to be necessary or appropriate to conduct the business of the Company and to exercise all powers and

3

effectuate the purposes set forth in this Agreement." (Dkt. No. 10-2 at 21.) The only exception to the Board's management authority was "situations in which the approval of the Members is expressly required by the terms of this Agreement or by applicable law." (*Id.*) The Board would consist of three Directors, two appointed by Laninver and one appointed by Khan. Currently, the three Directors are "Mr. Khan and, by designation of Laninver, Laninver's Chief Executive Officer and President of Grupo Lantero, defendant Enric Holzbacher, and Emsur's Chief Executive Officer, defendant Alain Zijlstra." (Dkt. No. 1 at 6.) Under the agreement, "[e]xcept as otherwise provided in any other provision of this Agreement, the act of a 75% majority of the Directors entitled to vote on any matter will be the act of the Board." (Dkt. No. 10-2 at 22.) Because the agreement for some reason required a 75 percent vote of three Directors before the Board could act, it created a structure "necessitating unanimous consent and empowering any one Director to block Board action on behalf of Ultrapak." (Dkt. No. 1 at 6.) The agreement does not appear to mention any position of "corporate counsel" or "in-house counsel" explicitly. Under Section 5.8 of the agreement, however, the Board "may also appoint such additional Officers as the Board may deem necessary or appropriate from time to time, and such Officers will have titles, perform such duties and have such powers as the Board may from time to time prescribe." (Dkt. No. 10-2 at 24.) This early in the case, the Court can only surmise that Schmidt's involvement with Ultrapak arose as one of these "additional Officers." The one Officer explicitly defined in the agreement is the Chief Executive Officer ("CEO"). The CEO, currently Khan,

> will in general supervise and control all of the business and affairs of the Company, subject to the direction and control of the Board, and will see that all orders of the Board are carried into effect. The Chief Executive Officer may sign bonds, mortgages and all other contracts and documents which have been approved by the Board, except in cases where the signing and execution thereof is expressly delegated by law, by the Board or by this Agreement to some other Officer or agent of the Company. The Chief Executive Officer will have general powers of supervision and will be the final arbiter of all differences between Officers of the Company and the

> Chief Executive Officer's decision as to any matter affecting the Company will be final and binding as between the Officers of the Company, subject only to the Board. The Chief Executive Officer will report to the Board on a regular basis or more frequently as requested or required by the Board from time to time.

(*Id.*)

As the complaint alleges, Ultrapak soon soured on its new relationship with Laninver. In short, as Ultrapak acquired new customers and orders, it had to route fulfillment of the orders to various factories in the Emsur/Laninver corporate family that lacked experience and essential equipment. (*See* Dkt. No. 1 at 7.) The lack of experience and essential equipment led to poor scheduling and to product defects, which in turn caused delays and additional expenses as Ultrapak scrambled to compensate with extra capacity at its Dunkirk, New York facility. (*See id.* at 8–10.) The alleged problems also ran counter to various promises that Laninver made about resources that would be available to Ultrapak. (*Id.* at 6.) The ongoing problems eventually split the Board of Directors amidst accusations of sabotage. "For example, in July, 2017, Emsur USA's General Manager inexplicably violated the confidentiality provisions of the parties' acquisition documents by taking it upon himself to unilaterally inform Ultrapak's production manager and customer service manager of the acquisition plans as well as the contracted length of Mr. Khan's term of employment, presenting Mr. Khan and Ultrapak as ineffectual and having little power and influence over Ultrapak's present and future business plans and operation, and thereby seeking to undermine Mr. Khan's effectiveness as Chief Executive Officer of Ultrapak." (*Id.* at 13.) Khan tried to rectify the violation that he perceived but could not make any progress with a divided Board:

> In October, 2017, at Mr. Khan's request, a meeting of Ultrapak's Board of Directors was held in which Mr. Khan sought Board approval to take action against Emsur USA for its unauthorized disclosure of confidential information and efforts to steal Ultrapak's key employees, sales agent and customer accounts. Specifically, Mr. Khan proposed that Ultrapak require Emsur USA, as a condition of continuing the parties' business relationship, to terminate the employment of its General Manager who engaged in the offensive and damaging conduct.

5

> At the vote of Mr. Khan's proposed resolution, Ultrapak's two remaining Directors, themselves the Chief Executive Officers of Emsur and Laninver, voted against and therefore blocked the proposed action.  In so doing, Messrs. Holzbacher and Zijlstra acted, not in the best interest of Ultrapak under any standard of good business judgment, but to deliberately and intentionally undermine and damage Ultrapak in furtherance of Emsur's and Laninver's own interests.

(*Id.* at 14–15.)  In reciting allegations from the complaint about dissension within the Board, the Court is not making any findings about those allegations.  The Court instead is making two points.  First, plaintiffs themselves are alleging a level of division within the Emsur/Laninver/Ultrapak corporate structure that raises questions about who authorized the present litigation, which may or may not fall within the scope of day-to-day business under the governing agreement.  Second, Schmidt drafted the complaint and is noticeably absent from any of the events alleged in it.  There is a high probability that Schmidt is a factual witness to at least some of the events alleged in the complaint, which in turn helps to set up the Court's analysis below.  Schmidt bolstered this probability through his motion papers when he ascribed to defendants a motive that would not be apparent on the face of customer orders and complaints but would be known to a corporate counsel with personal factual knowledge:

> This action is not, as movants would have the Court believe, akin to a shareholder dispute occasioned by a disagreement amongst or between the membership of plaintiff Ultrapak, LLC ("Ultrapak," or alternatively, the "Company") about governance of the Company or the Company's operations or finances.  Rather, this is an action brought by an entity under direct and sustained attack from both internal and external forces which, acting in concert and under common ownership by the same parent company, willfully and intentionally harmed Ultrapak, stole its key sales agent and customers, sharply reduced its revenue and drove up its costs and debts, and damaged its business reputation, earnings potential and customer relationships, all for the purpose of devaluing Ultrapak and rendering it insolvent in order to unlawfully acquire 100% of its ownership interest and customer accounts.  Make no mistake here: the instant motion is, without question, asserted for tactical reasons, and in furtherance of these end-goals.

(Dkt. No. 15 at 7.)  Schmidt bolstered this probability further when, prior to litigation, he informed attorneys for Laninver that "I should also note that *I formed Ultrapak* and have been the company's

6

attorney since prior to Mr. Khan's transfer of an ownership interest to Laninver. This, too, suggests that Board action was not necessitated to retain me, but to fire me, which obviously did not occur here." (Dkt. No. 10-1 at 2 (emphasis added).)

Plaintiff's filed their complaint on May 17, 2018. The complaint contains three claims. In the first claim, plaintiffs accuse defendants of breach of contract in the amount of at least $9 million. Because the entire first claim runs two sentences long, the contract referenced is not clear—*e.g.*, the governing agreement or perhaps a contract with the customer undermined by product defects and delays. In the second claim, plaintiffs accuse defendants of a breach of fiduciary duty in the amount of at least $9 million. In the third claim, plaintiffs accuse defendants of tortious interference with customer relationships in the amount of at least $9 million.

Defendants filed the pending motion on July 16, 2018. Defendants argue for disqualification on the basis that Schmidt, as corporate counsel, has obligations to defendants that prohibit him from choosing sides in litigation. "As Mr. Schmidt himself admits, the parties have not (and will not) expressly agree to allow him to represent both Ultrapak and its shareholder/employee, Mr. Khan. (*See* Exhibit A ('this Board is and will remain invariably deadlocked and unable to take any meaningful action on behalf of the company . . ..').) Nevertheless, Mr. Schmidt has pressed on with their representation, pitting Mr. Khan against his fellow shareholder, and, more importantly, *Ultrapak* against its majority shareholder." (Dkt. No. 9-1 at 12.) Defendants argue further that "Mr. Schmidt's conflict is ongoing and deepening. For example, plaintiffs have unilaterally concluded portions of Ultrapak's operating agreement are no longer valid and controlling." (*Id.* at 13.) Defendants deny moving for disqualification for any tactical reasons, but plaintiffs insist otherwise. "Here, defendants' counsel has failed to substantiate the meritless claim that Mr. Schmidt's participation would pose a significant risk of trial taint. Little or no effort is made to present factual

7

or legal grounds for disqualification on an objective basis, as required.  Not a single Rule of Professional Conduct is cited, and not one code from either the ABA Model Code of Professional Responsibility, or the New York Code of Professional Responsibility was used to form an objectively sufficient basis for the motion.  Without a factual or legal basis, the alleged conflict of interest is illusory."  (Dkt. No. 15 at 15.)  Plaintiffs then note that defendants have their own counsel for this matter, that corporate counsel are attorneys for the organization absent strong indications otherwise, and that there is no reason to believe that litigation here required authorization from the Board.  Defendants in their reply papers returned to the theme of Schmidt authorizing himself to act on behalf of Ultrapak:

> Moreover, plaintiffs' claim that its counsel remains authorized to represent Ultrapak because he has never been "removed" by Ultrapak's Board is disingenuous (since it was never disclosed to defendants), and flies in the face of the above cases. Defendants' inability to remove Mr. Schmidt is a byproduct of the complete breakdown of the ability of the Board to agree on basic decisions concerning the management of Ultrapak, as plaintiffs recognize.  (*See* Ex. A.)  Ultimately, it is this breakdown in the management of Ultrapak that is fatal to plaintiffs' opposition. Indeed, the dynamics of the representational issues in this case make it impossible for plaintiffs' counsel to continue to represent both Mr. Khan and Ultrapak against Laninver (Ultrapak's majority shareholder) and Messrs. Holzbacher and Zijlstra (Ultrapak's defendant directors) without taking sides.  In this case, the ethical conflict between Khan and Ultrapak that requires disqualification is that plaintiffs have hijacked Ultrapak to sue its majority shareholder and a majority of its Board.

(Dkt. No. 16 at 6.)

### III. DISCUSSION

#### A. *Disqualification Motions Generally*

"The disqualification of an attorney in order to forestall violation of ethical principles is a matter committed to the sound discretion of the district court." *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir. 1990) (citations omitted).  "The authority of federal courts to disqualify attorneys derives from their inherent power to preserve the integrity of the adversary process.  In

exercising this power, we have attempted to balance a client's right freely to choose his counsel against the need to maintain the highest standards of the profession." *Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005) (internal quotation marks and citations omitted).

### B.  New York Rules of Professional Conduct

"Attorneys practicing in this Court shall faithfully adhere to the New York Rules of Professional Conduct.  In interpreting the New York Rules of Professional Conduct, absent binding authority from the United States Supreme Court or the United States Court of Appeals for the Second Circuit or significant federal interests, this Court, in the interests of comity and predictability, will give due regard to decisions of the New York Court of Appeals and other New York State courts." W.D.N.Y. Local Civ. R. 83.3(a).  After reviewing the motion papers, the Court finds that two aspects of the Rules of Professional Conduct require further attention.

#### i.    *Conflict of Interest*

The Court first will consider whether Schmidt has a straightforward conflict of interest under the Rules of Professional Conduct.  "Except as provided in paragraph (b), a lawyer shall not represent a client if a reasonable lawyer would conclude that either: (1) the representation will involve the lawyer in representing differing interests; or (2) there is a significant risk that the lawyer's professional judgment on behalf of a client will be adversely affected by the lawyer's own financial, business, property or other personal interests." N.Y. R. Prof. Con. Rule 1.7(a).  As for paragraph (b), "a lawyer may represent a client if: (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client; (2) the representation is not prohibited by law; (3) the representation does not involve the assertion of a claim by one client

against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and (4) each affected client gives informed consent, confirmed in writing." *Id.* Rule 1.7(b).

The posture of this case presents several problems under Rule 1.7. Schmidt is correct generally when he says that, as Ultrapak's corporate counsel, Ultrapak officially is his client. Corporations have to act through their people, however, and there is at least a serious question as to how Ultrapak would have asked Schmidt to represent it in new litigation. *See Evans v. Artek Sys. Corp.*, 715 F.2d 788, 792 (2d Cir. 1983) ("A 'corporate attorney'—whether an in-house lawyer or a law firm that serves as counsel to the company—owes a duty to act in accordance with the interests of the corporate entity itself. His client is the corporation. He may not serve the corporation in a particular matter and then represent a plaintiff in a suit against it *or its officers* in a substantially related matter.") (emphasis added) (citations omitted). One Director is suing the other two, and the minority owner of the company is suing the majority owner. The governing agreement—written in strange fashion to require 75 percent of a three-person Board of Directors—essentially has paralyzed the company by requiring unanimous Board assent for significant actions. How, then, does Schmidt know that Ultrapak wanted to commence this litigation or that this litigation represents Ultrapak's best interests? Schmidt has argued that Khan, as CEO, can authorize this litigation within the scope of his day-to-day management authority. Whether one-time litigation can count as day-to-day management affairs, however, is not clear from the face of the governing agreement and is at least an open question. That open question brings the Court to the heart of the problem. According to Schmidt, "I formed Ultrapak and have been the company's attorney since prior to Mr. Khan's transfer of an ownership interest to Laninver." (Dkt. No. 10-1 at 2.) Schmidt's close relationship with Khan and his role in creating the LLC means that he must have been privy to communications regarding the propriety of the merger and of the governing agreement. Put another

10

way, Schmidt almost certainly gave Khan advice about whether to sell a majority interest to Laninver in the first place and about whether the governing agreement made sense. As some of the weaknesses in the governing agreement potentially are unfolding, there is a chance that Schmidt will face exposure from Khan about his due diligence and the quality of his advice leading up to the merger. *Cf. Decker v. Nagel Rice LLC*, 716 F. Supp. 2d 228, 235 (S.D.N.Y. 2010) ("By contrast, Lowy [the disqualified attorney] would be on opposing sides of this litigation. He would represent plaintiffs in pursuit of their malpractice claims while simultaneously defending his own potential responsibility for their alleged damage. Lowy could not reasonably be expected to maintain full candor with the Court and advocate zealously for his clients when he could be found liable if his clients are successful."). Schmidt has a direct personal interest in minimizing potential exposure by choosing interpretations of the governing agreement that 1) allow him and Khan to litigate without authorization from a fractured Board; and 2) allow him to represent Ultrapak against its own majority owner. This direct personal interest likely conflicts with decisions that Ultrapak's majority owner would make. *Cf. Univ. of Rochester v. G.D. Searle & Co.*, No. 00-CV-6161L B, 2000 WL 1922271, at *10 (W.D.N.Y. Dec. 11, 2000) ("[T]here is ample case law which supports the proposition that, for conflict purposes, representation of a subsidiary corporation is equivalent to representation of the parent, and vice-versa.") (citations omitted). That conflict exists independent of the additional problem that Khan, having worked with Schmidt before the LLC ever existed, likely relied on Schmidt's advice about the merger and reasonably could consider himself Schmidt's client. The Court also is not forgetting that a successful lawsuit by Ultrapak against Laninver for at least $9 million will have an indirect detrimental effect on Ultrapak, because of the damage done to Ultrapak's own parent. *Cf. Cincinnati Bell v. Anixter Bros, Inc.*, No. C1-93-871, 1994 WL 1877173, at *3 (S.D. Ohio June 27, 1994) ("We cannot imagine how an attorney can maintain a duty of

11

undivided loyalty to a client, while at the same time zealously attempting to exact millions of dollars of damages from a sister corporation."). Under these circumstances, Schmidt will not be able to reconcile his personal interest in particular interpretations of the governing agreement with the interests of Ultrapak and Khan individually. Further representation by Schmidt therefore would violate Rule 1.7(a). Schmidt will not be able to avail himself of the exception in Rule 1.7(b). Even if Khan gave his consent to the situation, whether and how Ultrapak could do so is unclear.

    ii. *Attorney-Witness Rule*

There is another ethical consideration that has drawn the Court's attention, a consideration that is apparent in the record and referenced in the parties' arguments. (*See, e.g.*, Dkt. No. 15 at 12.) Simply put, what is the likelihood that Schmidt, whose corporate counsel role predates the governing agreement and who has stated that "I formed Ultrapak" (Dkt. No. 10-1 at 2), would have to testify about problems that arose between the Directors and between Ultrapak and Emsur/Laninver? With exceptions, "[a] lawyer shall not act as advocate before a tribunal in a matter in which the lawyer is likely to be a witness on a significant issue of fact." N.Y. R. Prof. Con. Rule 3.7(a). Of the available exceptions, the only one that possibly could apply here would allow the advocacy if "disqualification of the lawyer would work substantial hardship on the client." *Id.* Rule 3.7(a)(3). Regardless of any exceptions, "[a] lawyer may not act as advocate before a tribunal in a matter if the lawyer is precluded from doing so by Rule 1.7 or Rule 1.9." *Id.* Rule 3.7(b)(2). "That the lawyer may not actually testify is not controlling. What matters is that he ought to testify . . . . The test is whether the attorney's testimony could be significantly useful to his client; if so, then he ought to be called." *MacArthur v. Bank of New York*, 524 F. Supp. 1205, 1208 (S.D.N.Y. 1981) (citation omitted).

Here, Schmidt has created some ambiguity about what role he had in creating the governing agreement and guiding Ultrapak to its merger with Laninver. (*Compare* Dkt. No. 10-1 at 2 ("I should also note that I formed Ultrapak and have been the company's attorney since prior to Mr. Khan's transfer of an ownership interest to Laninver.") *with* Dkt. No. 15 at 16 ("Defendants' counsel of record Michael A. Duffy, Esq. and the Baker & McKenzie LLP firm are the attorneys who drafted all operable documents in this action, including the LLC Agreement which they now erroneously assert was drafted by Mr. Schmidt. Defendants never once communicated with or was advised by Mr. Schmidt in any manner whatsoever.").) Additionally, there is a likelihood that Schmidt was aware of and engaged in some communications regarding the alleged product defects and delays as those problems unfolded. *Cf. New England Sec. Corp. v. Stone*, 941 N.Y.S.2d 539, 2011 WL 6411555, at *5 (Sup. Ct. 2011) (table case) ("Stone [the disqualified attorney] is the only person who can explain why he informed Kayne that Arteca and Vetere accepted the Form U–5 language, which Arteca and Vetere now, in their counterclaims, contend is false and inaccurate. Only Stone can explain how his representations to Kayne concerning the Form U–5 language do not directly contradict these counterclaims."). Schmidt's testimony, at a deposition or at trial, likely will influence the credibility of plaintiffs' allegations about the origin and nature of the defects in question. *Cf. Kattas v. Sherman*, 820 N.Y.S.2d 631, 633 (N.Y. App. Div. 2006) ("The defendant is correct that the counsel for the plaintiffs should have been disqualified. The plaintiffs' counsel is a potential witness in the determination of the breach of contract issue, and was intimately involved in the failed purchase of the property."). Schmidt's testimony also will clarify his own allegations about ulterior motives for undermining Ultrapak's value. *Cf. Ramchair v. Conway*, 601 F.3d 66, 75 (2d Cir. 2010) (affirming attorney disqualification where criminal defense attorney wanted to testify about objecting to a lineup procedure); *United States v. Kwang Fu Peng*, 766 F.2d 82, 85 (2d Cir. 1985)

13

(affirming attorney disqualification where criminal defense attorney was "a participant in one of the contested events relating to the alleged fraud") (internal quotation marks omitted); *Zweig v. Safeco Ins. Co. of Am.*, 509 N.Y.S.2d 320, 321 (N.Y. App. Div. 1986) (reversing denial of disqualification motion, where attorney at the center of an alleged bad-faith failure to settle was "an essential witness in this litigation"). As a corporate counsel, Schmidt has no equivalent to a law firm partner who can take over the advocacy role. *Cf. Adams v. Suozzi*, 340 F. Supp. 2d 279, 284 (E.D.N.Y. 2004) ("The Plaintiffs assert that Mr. Axelrod is not appearing as a litigator in this case, but rather, the advocacy role is being performed by his partner, Wayne Schaefer, Esq., and an associate . . . . At this time, the Defendants have not rebutted Plaintiffs' assertion that Mr. Axelrod will not appear as the litigator in this matter.") (citation omitted). At the same time, the record does not show any signs of a hardship that would ensue if an outside advocate took up the case for plaintiffs. With or without hardship, Schmidt is conflicted under Rule 1.7 for the reasons expressed above, meaning that any hardship exception would not apply under Rule 3.7(b)(2).

Consequently, Schmidt's likelihood of appearing as a fact witness at some point in this case provides an additional reason to disqualify him from advocating for plaintiffs.

### C. Recommendation for Motion to Dismiss (Dkt. No. 7)

When defendants filed the pending motion to disqualify Schmidt, they also filed a motion to dismiss the complaint. (Dkt. No. 7.) The Court decided to hold the motion to dismiss in abeyance while addressing the motion to disqualify. (Dkt. No. 14.) With the Court granting the motion to disqualify, defendants should have an opportunity to see what steps plaintiffs' new counsel will take before proceeding with any motion to dismiss. This Court cannot act on the motion to dismiss directly because it is a dispositive motion. Instead, the Court issues this brief recommendation. Defendants are encouraged to withdraw the motion to dismiss without prejudice to file an updated

motion upon the appearance of new counsel.  Alternatively, the Court recommends to Judge Vilardo that the motion to dismiss be denied without prejudice.

## IV.     CONCLUSION

For all of the above reasons, the Court grants defendants' motion to disqualify plaintiffs' counsel (Dkt. No. 9).  Plaintiffs will file a notice of appearance of new counsel within 35 days of the date of this Decision and Order.  The Court will schedule a status conference upon the appearance of new counsel.

The Court also recommends that the pending motion to dismiss (Dkt. No. 7) be denied without prejudice, if defendants do not first withdraw it without prejudice.

SO ORDERED.

__/s Hugh B. Scott_____
Hon. Hugh B. Scott
United States Magistrate Judge

DATED: January 17, 2019

15