UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

───────────────────────────────

Khalid M. Khan,

                                Plaintiff,

        v.

Laninver USA, Inc.,

                                Defendant.

**Report and Recommendation**

18-CV-561V

───────────────────────────────

**I.    INTRODUCTION**

      Plaintiff Khalid M. Khan ("Khan") owned a company that specialized in shrink sleeve product packaging. Defendant Laninver USA, Inc., a holding company in a large corporate family associated with product packaging, took an interest in Khan's company. The parties struck a deal in which defendant would buy out Khan's company in two stages. Defendant first would buy a majority stake in Khan's company. Under the deal, if the net earnings by Khan's company crossed a certain threshold number then defendant was contractually obligated to finish buying out Khan for a value set by formula in the contract. The formula potentially would net Khan a sale price into eight figures. Critically, the deal between the parties was silent as to what would—or would not—happen if Khan's company did *not* cross that important threshold number. Khan believes that defendant exploited that loophole in the deal by making intentionally bad management decisions as majority owner that guaranteed that Khan's company would not cross the threshold. A failure to cross the threshold, according to Khan, would let defendant escape the contractual mandate and would give defendant the option of pressuring Khan into selling his company cheap.

      To pursue his accusations against defendant, Khan has an active amended complaint against defendant that contains accusations of breach of fiduciary duty and failure to indemnify against

losses. (Dkt. No. 29.) The case currently comes before the Court on a motion by defendant to dismiss the amended complaint altogether (Dkt. No. 33) under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Very briefly, defendant argues that Khan has not sufficiently pleaded a violation of a specific provision of the deal between the parties, including any provision that would give rise to a fiduciary duty. Defendant also believes that Khan's claimed damages are too speculative. Khan responds that he has cited explicit provisions of the deal between the parties that defendant has breached and that lead to specific damages. Khan argues further that the breach of fiduciary duty arises from defendant's failure, as a majority owner, to look out for his interests as the minority owner.

District Judge Lawrence J. Vilardo has referred this case to this Court under 28 U.S.C. §§ 636(b)(1)(A) and (B). (Dkt. No. 11.) The Court held oral argument on November 20, 2019. For the reasons below, the Court respectfully recommends granting the motion to dismiss in part.

## II. BACKGROUND

### A. Initial Events and the Purchase Agreement

This case concerns allegations[1] that defendant intentionally damaged Khan's contractual business options to allow it to buy him out at an improper discount. Until 2012, Khan owned a company called Shaant Industries, Inc. in Dunkirk, New York. Shaant Industries, Inc. was "a producer of shrink sleeve product packaging in the North American shrink sleeve and flexible packaging industry." (Dkt. No. 29 at 1.) In 2012, defendant approached Khan to discuss acquiring his company to expand its global shrink-sleeve operations into the United States and Canada. The Court will use the name "Laninver" to refer collectively to defendant and to what appears to be a complex network of holding companies:

---

[1] For the sake of brevity, the Court will omit repeated use of the words "alleged" or "allegedly" when describing the allegations in the amended complaint. Nothing in this background section constitutes a factual finding unless otherwise noted.

> At all relevant times, Laninver is a holding company with no business operations of its own, wholly owned by Laninver S.H.C. S.L. based in Madrid, Spain, which, in turn, is wholly owned by Grupo Lantero, an international company also headquartered in Madrid, which is a prominent player in the global packaging industry, including multiple European and North and South American markets, with controlling ownership interests in multiple product line group companies.
>
> As it is relevant to this action, one of Grupo Lantero's holdings consists of "Emsur," itself a parent company and/or group of business entities with at least 10 production plants dedicated to the manufacture of flexible packaging primarily for packaging food and dairy products in countries spanning the Americas, Europe, Africa, the Middle East, and Asia.
>
> Among other subsidiary companies and businesses, Emsur serves as the parent entity for Emsur USA LLC ("Emsur USA"), a Delaware limited liability company formed on December 16, 2013, and thereafter qualified to do business in the State of Illinois where it maintains its principal place of business at 2800 Carl Boulevard in Elk Grove Village, the same business location as defendant Laninver.
>
> Defendant Laninver is the manager of Emsur USA.
>
> Emsur also serves as the parent entity of other related subsidiaries, including, but not limited to, business entities commonly referred to within the Grupo Lantero family of businesses as "Emsur Mexico," "Emsur Spain," and "Emsur Poland." At all relevant times, Emsur's plants in the United States, Mexico, Spain, and Poland produce printed flexible packaging.

(*Id.* at 3.) The discussions continued for about three years and culminated in two agreements. On March 16, 2015, Khan and Laninver entered a Memorandum of Understanding. (Dkt. No. 34-1.) Through the Memorandum of Understanding, the parties declared their intent to have Shaant Industries, Inc. reorganize as Ultrapak LLC ("Ultrapak"). Laninver then intended to purchase a 51 percent stake in Ultrapak to become its majority owner; Khan would be the only other member of the new LLC and would hold a 49 percent stake.

A few months later, on July 8, 2015, Khan and Laninver made their intentions formal when they entered a Membership Interest and Note Purchase Agreement (the "Purchase Agreement"). (Dkt. No. 34-2.) The Purchase Agreement contains many details about how the parties would set up Ultrapak and take their ownership interests in it. Some of the details have particular relevance to

3

the pending motions. Section 2 of the Purchase Agreement is the core of the agreement and describes how transfer of ownership would occur in two phases. Section 2.1 describes the first phase, called an Initial Interest: Khan would sell Laninver a 51 percent interest in Ultrapak. (*Id.* at 5.) Section 2.2 describes a conditional second phase called the Additional Interest. The Court is oversimplifying here, but in essence, if Ultrapak's net revenues for the 12 months ending June 30, 2018 met or exceeded $4.5 million then Laninver was required ("shall purchase from Khan") to buy out Khan's remaining 49 percent ownership stake. (*Id.*) The amount of the purchase under Section 2.2 would follow a formula described elsewhere in Section 2 and could run as high as several times the net revenues in question. (*Id.* at 6.) Closing each phase of the ownership transfer would require Laninver to make certain representations and warranties about documentation and financing. (*Id.* at 9, 10.) Under Sections 4.1(c)(ii) and 4.2(c)(iii), the parties were required to comply "in all material respects [with] all agreements, obligations and conditions contained in this Agreement" for each phase of the ownership transfer. (*Id.* at 9, 10.) Under Section 6, Laninver provided representations and warranties to Khan pertaining to authority to enter the Purchase Agreement and the representations that it made to Khan. (*Id.* at 15.) In Section 8.3, the parties agreed that the Purchase Agreement with attached exhibits constituted "the full and entire understanding and agreement between the parties." (*Id.* at 16.) In Section 8.5, the parties agreed that New York law would govern the Purchase Agreement.

For purposes of the pending motions, the most important section of the Purchase Agreement is Section 7.2. Section 7.2 is titled "Indemnification by Purchaser [*i.e.*, Laninver]" and reads in its entirety as follows:

> The Purchaser hereby agrees to indemnify and hold harmless Khan from and against all Losses that he may incur as a result of (a) the breach of any representation or warranty of the Purchaser in this Agreement or (b) the breach of any covenant of the Purchaser in this Agreement or any Ancillary Agreement or (c) the fraud or

4

willful misconduct of the Purchaser in connection with the offer, sale or transfer of
the Note or Interests.

(*Id.* at 15.) The Purchase Agreement does not appear to contain any express warranties or covenants from Laninver beyond what appears in Sections 4.1(c)(ii), 4.2(c)(iii), and 6. The reference to representations could refer generally to the accuracy of financial and other statements that Laninver had to provide as part of the transfer of ownership. The Purchase Agreement does not provide its own definition of "fraud" or "willful misconduct." Based on Section 1.39, the "Note" refers to Section 3.1 and a loan that Laninver would provide Khan in the first phase of ownership transfer. (*Id.* at 5, 7.) Based on Section 1.24, the "Interests" refer to the two phases of ownership transfer described in Sections 2.1 and 2.2. (*Id.* at 5.)

### B. The Breakdown of the Relationship

The parties closed the first phase of the ownership transfer in 2016. By that time, according to Khan, "Ultrapak worked to establish connections within the beverage industry, the fastest growth segment of the shrink sleeve market, and formed key relationships pivotal to development of the California beverage market, all in furtherance of the parties' business plan, and in reliance upon the promises and representations made by Laninver and Emsur that Emsur was dedicating sufficient resources to Emsur USA in the form of printing presses, finishing equipment, and experienced personnel and that Emsur USA would set aside sufficient capacity to capably produce quality finished goods in its Chicago plant for Ultrapak's domestic customers, within the customers' shipment deadlines and at competitive delivered prices." (Dkt. No. 29 at 8.) Once Ultrapak became part of the Laninver family, however, Khan became alarmed at significant quality and other logistical problems that arose. "At Laninver's direction, Ultrapak's first orders following the acquisition were placed not with Emsur USA, but through Emsur Mexico which was designated as the initial production plant to support Ultrapak while Emsur purportedly worked to bring its Emsur USA

5

plant online as Ultrapak's prime supplier. However, as Ultrapak's orders increased, Emsur Mexico missed delivery deadlines and produced poor quality goods, resulting in numerous customer and co-packer complaints and exhaustive efforts by Ultrapak to work to correct product deficiencies." (*Id.* at 9.) To correct Laninver's deficiencies, "Ultrapak was forced to further ramp up its finishing operation to compensate for Emsur USA's refusals to divert proper resources and inability to produce quality finished products, in an effort to save the customer accounts acquired by Ultrapak in reliance upon the representations made by Emsur and Laninver and in an effort to protect its business reputation which suffered as a result of Emsur's recurring product and delivery deficiencies." (*Id.* at 10.) Khan came to believe that Laninver's deficiencies had ethical implications as well. "Laninver, despite its fiduciary obligations to Plaintiff as the minority interest holder and its obligations during the earn-out period as a party to the Purchase Agreement, willfully usurped opportunities from Ultrapak for Emsur's benefit and constantly prioritized Emsur's business strategies over those of Ultrapak and to the detriment of Plaintiff." (*Id.* at 9.) Some of Laninver's deficiencies led to overcharges for "wasted and unused product" that could not be sent to customers; the overcharges ran into the hundreds of thousands of dollars. (*Id.* at 16.) Khan believes that all of the harm that Ultrapak suffered did not result from mistakes but rather an intentional business strategy:

> On numerous occasions, when Plaintiff complained and voiced his concerns about his earn-out rights and the promises by and obligations of Laninver, Emsur would respond (including in writing). Indeed, even when minutes were being circulated for review and edit after board meetings involving Ultrapak directors (which involved Plaintiff and two Laninver representatives), a representative of Emsur would respond and note "Emsur" next to the comments or suggested changes. Laninver representatives ceded total control to and acted as one with Emsur, despite any duties and obligations to Plaintiff.
>
> As described above, Emsur and Laninver were wholly deficient in providing everything that had been represented to Ultrapak at the time of acquisition, in that Ultrapak was not provided the capacity necessary to meet its sales; production was

6

diverted to Emsur's overseas plants rendering Ultrapak unmarketable to domestic high-growth customers targeted in the parties' business plan; Emsur's finished products were inferior in quality; and Emsur was too often unwilling to meet its own delivery forecasts or prioritize representations made to Plaintiff, which knowingly damaged Plaintiff's earn-out rights in both lost sales and increased costs to Ultrapak, thereby reducing the Net Turnover under the Purchase Agreement.

(*Id.* at 14.) "Thus, Defendant intentionally tanked the business of Ultrapak so that it could avoid its payment obligations to Plaintiff, while also taking advantage of the business created through the impacts on Ultrapak as a prior competitor." (*Id.* at 18.) According to Khan, the problems that Ultrapak had as part of the Laninver family worsened into a full-blown financial crisis. "In April 2018, with the knowledge and consent of Laninver, and under its direction, representatives of Emsur met alone with Ultrapak's sales agent and informed him that Ultrapak was in serious financial crisis and there was a credit hold on all its orders, causing him to terminate his relationship with Ultrapak and attempt to move the customer accounts which he serviced to Emsur directly." (*Id.* at 20.) Khan found himself with no remedies short of litigation. "Despite Plaintiff's and Ultrapak's repeated requests, Defendant and Emsur have since refused to engage in any effort to review the illegitimate charges and over-billings which form the bulk of the monies Emsur ostensibly claimed it was owed and has used as a stated basis for halting production and shipments." (*Id.*)

### C. This Litigation

Khan commenced this case by filing his original complaint on May 17, 2018. The original complaint included Ultrapak itself as a plaintiff; this inclusion raised some issues concerning an attorney conflict of interest and how Ultrapak would be represented. (*See generally* Dkt. Nos. 17, 27, 28.) With the help of new counsel (the present counsel), Khan filed an amended complaint naming himself the sole plaintiff. (Dkt. No. 29.) The amended complaint contains three claims. In the first claim, Khan accuses Laninver of violating Section 7.2 of the Purchase Agreement. According to Khan, "Laninver worked to minimize Ultrapak's new and existing business and to increase its

expenses so that it did not 'have to pay too much for [Plaintiff's] buyout' and could instead 'buy [Plaintiff] on the cheap,' and engaged in other willful misconduct." (*Id.* at 21.) Khan's theory of liability is that "Laninver has at the very least engaged in 'willful misconduct' in connection with the sale and transfer of Plaintiff's membership interests in Ultrapak and therefore is required to indemnify Plaintiff, individually, pursuant to Section 7.2 of the Purchase Agreement for Losses suffered by Plaintiff as a result of such conduct." (*Id.* at 22.) In the second claim, Khan accuses Laninver of breach of fiduciary duty. Simply put, Khan asserts that Laninver owed him, as minority member, fiduciary duties. "In accordance with its fiduciary duties, Laninver must treat Plaintiff with the utmost fairness, may not take any actions solely for its personal gain or that usurp (for itself or Emsur) opportunities and benefits from Plaintiff, at the expense of Plaintiff, and may not deal with Plaintiff in an unfair or inequitable manner. Laninver breached its fiduciary duties to Plaintiff by, among other things, placing its own interests above those of Plaintiff, neglecting Plaintiff's rights and concerns, ceding control of decisions and priorities and otherwise acting as one with Emsur, and advancing Emsur's interests at the direct expense of Plaintiff, including by prioritizing Emsur's customers, usurping opportunities and employees that would have benefitted Plaintiff's interests, and secretively working to stunt Ultrapak's earnings so as to reduce or eliminate its earn-out obligations to Plaintiff." (*Id.* at 23.) In the third claim, Khan invokes Section 7.2 of the Purchase Agreement to assert that Laninver has a contractual obligation to indemnify him for all of the losses that he incurred "as a result of Laninver's willful misconduct and contractual breaches." (*Id.* at 24.)

### D. The Pending Motion

Laninver filed the pending motion to dismiss on September 16, 2019. Laninver seeks dismissal of the amended complaint on several grounds. Laninver notes that the amended complaint contains numerous references to the Memorandum of Understanding and argues that the

Purchase Agreement superseded it and any associated oral promises. Laninver next argues that the claims in the complaint invoking Section 7.2 of the Purchase Agreement are "fatally vague" because Section 7.2 is only a general indemnification provision. According to Laninver, Khan never specifies in the amended complaint the specific actions that would constitute a breach of Section 7.2. "Indeed, Ultrapak's LLC Agreement gave Laninver approval over new business, since it required Ultrapak to obtain the consent of Laninver prior to marketing Ultrapak's products to a specific list of customers." (Dkt. No. 33-1 at 13.) Khan similarly cannot plead "willful misconduct" because the phrase comes from tort law and would be inappropriate in a contract setting. Laninver argues further that Khan lacks standing to bring his claim of breach of fiduciary duty. According to Laninver, all of the harm alleged in the amended complaint fell directly on Ultrapak and not on Khan personally. Any claim for injury, under this reasoning, thus would belong to Ultrapak and could not be asserted by Khan. Finally, Laninver argues that the only damages that Khan has asserted are conditional profits to himself that might have come during the second phase of the ownership transfer. "But, these conditional damages were not reasonably contemplated by the parties when they negotiated the MINPA [*i.e.*, the Purchase Agreement]. On the contrary, the MINPA was structured to allow for the possibility that Ultrapak might not even achieve the sales goals required to earn any earn out payment. In other words, the parties contemplated that Ultrapak might not achieve the sales necessary to obtain any further investment from Laninver, let alone the 'millions' in damages plaintiff claims." (*Id.* at 18.)

Khan opposes the motion to dismiss in all respects. Khan acknowledges that the amended complaint contains references to the Memorandum of Understanding but asserts that his claims rely exclusively on the Purchase Agreement:

> Laninver engaged in conduct to avoid its contractual payment obligations to Mr. Kahn. That conduct breached Section 7.2 in two independent ways. First, Laninver

9

breached Section 7.2(c) by engaging in willful misconduct in connection with Mr.
Khan's Ultrapak membership interest (including by intentionally tanking Mr. Khan's
earn-out rights). Second, Laninver breached Section 7.2(b) by acting in bad faith and
failing to indemnify Mr. Khan for its "breach of any covenant of [Laninver] in [the
Purchase Agreement]."

It is in relation to this latter independent breach that allegations referencing
the terms of the MOU are particularly relevant, even though a breach of the MOU is
not the basis of the claim. This is because the implied covenant of good faith and
fair dealing falls within the scope of covenants made by Laninver, and thus a breach
of the covenant of good faith and fair dealing constitutes a breach of Section 7.2(b).

(Dkt. No. 39 at 4.) Khan responds to any arguments about vagueness by citing events alleged in the amended complaint that give considerable detail about how Laninver gave Ultrapak short shrift to lower its value. Finally, Khan notes that Laninver conceded the existence of fiduciary duty owed to him as minority member of Ultrapak:

Laninver correctly acknowledges that, as a majority member of Ultrapak, it
owes Mr. Khan, individually, a fiduciary duty. Docket No. 33-1 at 12. *See also Berman
v. Sugo LLC*, 580 F. Supp. 2d 191, 204 (S.D.N.Y. 2008) ("Federal and state courts
have recognized that members of a limited liability company, like partners in a
partnership, owe a fiduciary duty of loyalty to fellow members."). Laninver also does
not contest the fact that, if proven, certain wrongful conduct alleged by Mr. Khan
could rise to the level of a fiduciary breach. Instead, Laninver's sole challenge to Mr.
Khan's fiduciary duty claim is based upon its belief that Mr. Khan does not seek
redress for any personal harm. Specifically, Laninver argues that Mr. Khan "seeks
redress for harm that Laninver purportedly caused to Ultrapak—not plaintiff
himself." Docket No. 33-1 at 11. That contention is conclusory and objectively
false. The only two interest holders in the company are Laninver and Mr. Khan.
Had Laninver acted in good faith and not otherwise breached its duties to Mr. Khan,
it would have paid money to Mr. Khan for his interests, not Ultrapak. And damage
to Mr. Khan's membership interests constitute damages to him, individually. Mr.
Khan's claims against Laninver are righteous.

(*Id.* at 13.)

### III. DISCUSSION

#### A. Motions to Dismiss Generally

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted). Courts assess Rule 12(b)(6) motions "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 61 (2d Cir. 2010) (internal quotation marks and citation omitted). "On a motion to dismiss, the court may consider any written instrument attached to the complaint as an exhibit or any statements or documents incorporated in it by reference." *Yak v. Bank Brussels Lambert*, 252 F.3d 127, 130 (2d Cir. 2001) (editorial and internal quotation marks and citation omitted). "Simply stated, the question under Rule 12(b)(6) is whether the facts supporting the claims, if established, create legally cognizable theories of recovery." *Cole-Hoover v. Shinseki*, No. 10-CV-669, 2011 WL 1793256, at *3 (W.D.N.Y. May 9, 2011) (internal quotation marks and citation omitted).

As a preliminary matter, the Court must decide whether to consider certain documents that have become part of the record but lie outside of the amended complaint. "Because a Rule 12(b)(6) motion challenges the complaint as presented by the plaintiff, taking no account of its basis in evidence, a court adjudicating such a motion may review only a narrow universe of materials. Generally, we do not look beyond facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, and matters of which judicial notice may be taken." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (internal quotation and editorial marks and citation omitted). "Where a document is not incorporated by reference, the court may

11

neverless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint. However, even if a document is integral to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document. It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (internal quotation marks and citations omitted). "A document is integral to the complaint where the complaint relies heavily upon its terms and effect. Merely mentioning a document in the complaint will not satisfy this standard; indeed, even offering limited quotations from the document is not enough. In most instances where this exception is recognized, the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason—usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the complaint." *Goel*, 820 F.3d at 559 (internal quotation and editorial marks and citations omitted).

While the analysis below does not necessarily rely on every document that the Court reviewed, the Court has been willing to consider several documents that appear in the record. The amended complaint contains references to the Memorandum of Understanding, both as a historical event between the parties and as examples of what "good faith" between the parties would have been. The amended complaint also relies heavily on the Purchase Agreement, and violations of it, to form the basis of Laninver's alleged liability. The Purchase Agreement, in turn, contains Exhibits A through I, which comprise the Ultrapak LLC Agreement and various documents related to the transfer of ownership. Subject to the actual consideration given below, the Court has decided that all of these documents are integral to the amended complaint. The Court has reviewed the documents accordingly.

### B. *Section 7.2 of the Purchase Agreement*

The Court now turns to the parties' arguments about Section 7.2 of the Purchase Agreement. Khan's claims under Section 7.2, and the parties' arguments about them, are admittedly confusing. On its face, Section 7.2 serves to protect Khan from damages that he would incur if Laninver breached the Purchase Agreement or committed some "fraud or willful misconduct" apart from breaching the agreement. This protective function of Section 7.2 appears superfluous. If Laninver had breached express provisions of the Purchase Agreement or had committed fraud then it would owe Khan damages whether Section 7.2 existed or not:

> A so-called "indemnification" clause which agrees to "indemnify" or "hold harmless" a contracting party only when the other party is solely at fault is legally a contribution clause based upon the degree of fault, not a contractual indemnification clause under New York law. In order to constitute a true indemnification clause, the contractual obligation must be to assume the cost of liability irrespective of fault. Under the contract at issue, neither party agreed to bear a loss it did not incur by its own acts. There was no shifting of liability, without regard to a degree of fault, by agreement or operation of law. As a matter of law, the parties' agreement to hold the other harmless from claims resulting from its sole negligence creates no greater obligation by contract than that which is already legally required by the law of contribution.

*Anderson v. Greyhound Lines, Inc.*, No. 06 CIV. 13371 GBD, 2011 WL 3480945, at *4 (S.D.N.Y. Aug. 3, 2011) (citations omitted). The New York Court of Appeals once elaborated, in the tort context, on how true indemnification puts a blameless party or non-party in the position of someone who is fully liable:

> To place the issue before us in focus, it is useful to restate the important substantive distinctions between contribution and indemnity. Basically, in contribution the loss is distributed among tort-feasors, by requiring joint tort-feasors to pay a proportionate share of the loss to one who has discharged their joint liability, while in indemnity the party held legally liable shifts the entire loss to another. Contribution arises automatically when certain factors are present and does not require any kind of agreement between or among the wrongdoers. Indemnity, on the other hand, arises out of a contract which may be express or may be implied in law to prevent a result which is regarded as unjust or unsatisfactory.

13

*Rosado v. Proctor & Schwartz, Inc.*, 484 N.E.2d 1354, 1356 (N.Y. 1985) (citations omitted). The distinct aspect of indemnification as a loss-shifting event after determination of liability leads to another confusing aspect of Khan's claims. Counts One and Three of the amended complaint, on the surface, do *not* allege an underlying or independent contractual breach or other liability-generating event. Counts One and Three allege *only* a breach of the contribution / indemnification provision in Section 7.2. The New York Court of Appeals, however, has held that "the indemnity claim is a separate substantive cause of action, independent of the underlying wrong." *McDermott v. City of New York*, 406 N.E.2d 460, 462–63 (N.Y. 1980); *accord City of New York v. Lead Indus. Ass'n, Inc.*, 644 N.Y.S.2d 919, 922–23 (N.Y. App. Div. 1996) ("The classic situation giving rise to a claim for indemnity is where one, without fault on its own part, is held liable to a third party by operation of law (frequently statutory) due to the fault of another."). Khan thus has left the Court to ponder two claims that Laninver has failed to reimburse him under Section 7.2 for unspecified wrongdoing that, if proven, would require reimbursement with or without Section 7.2. Put another way, the Court could view Counts One and Three as a request for declaratory judgment—a declaration that Laninver *would* owe Khan damages to be determined *if* it breached some other provision in the Purchase Agreement.

Without a firm accusation apart from a conditional requirement for indemnification, Khan has failed to state a cognizable cause of action. In reaching that conclusion, the Court wants to make clear that Khan has provided considerable factual detail for something that he believes that Laninver has been doing. Khan essentially has claimed that Laninver is exploiting a loophole in the Purchase Agreement. The Purchase Agreement specifies what would have happened if Ultrapak had hit a target number for net earnings during a certain 12-month period. The Purchase Agreement does not specify what would have happened if Ultrapak had missed the target number. Khan, in effect, is alleging that Laninver deduced that one or both of the following would occur if

14

Ultrapak missed the target number: 1) Laninver would be able to pressure Khan into selling his remaining ownership interest for much less than would have been required if the target number had been hit; and 2) an Ultrapak that missed the target number would be in such financial distress for other reasons that it would be desperate to find a buyer to rescue it. Several potentially cognizable causes of action suggest themselves, including a breach of the implied warranty of good faith and fair dealing. Khan has not, however, chosen a specific and substantive cause of action to pursue, and the Court should not guess how Khan might want to fit his factual narrative into a legal theory of liability. Khan has not identified a specific representation, warranty, or covenant in the Purchase Agreement that Laninver breached and that would give rise to indemnification under Sections 7.2(a) or (b). Any specific allegation of fraud to invoke Section 7.2(c) would require satisfying Rule 9(b); Khan has not done so through an amended complaint that does not specify fraud in the inducement, fraudulent reliance on a specific promise, or some other fraudulent event. Not even a request for declaratory judgment would work under the circumstances, since Khan has not properly pleaded a specific conflict of rights that could be settled through a declaratory judgment. *See, e.g., Beacon Const. Co. v. Matco Elec. Co.*, 521 F.2d 392, 397 (2d Cir. 1975) (declaratory judgment helps "to settle legal rights and remove uncertainty and insecurity from legal relationships without awaiting a violation of the rights or a disturbance of the relationships") (internal quotation marks and citation omitted). Under these circumstances, dismissal of Counts One and Three is appropriate. The Court accordingly recommends granting Laninver's motion with respect to Counts One and Three of the amended complaint.

### C. Fiduciary Duty to a Minority Member of an LLC

The Court next turns its attention to Count Two of the amended complaint and Khan's allegation of a breach of fiduciary duty. Under New York law,[2] "[t]he elements of a cause of action to recover damages for breach of fiduciary duty are (1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct." *Rut v. Young Adult Inst., Inc.*, 901 N.Y.S.2d 715, 717 (N.Y. App. Div. 2010) (citation omitted). Here, a fiduciary relationship between Khan and Laninver existed. Schedule A of the Ultrapak LLC Agreement lists both Khan and Laninver as the two members of Ultrapak (Dkt. No. 34-4 at 40), and "members of a limited liability company, like partners in a partnership, owe a fiduciary duty of loyalty to fellow members." *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 204 (S.D.N.Y. 2008) (citations omitted). Khan has pleaded misconduct by way of asserting Laninver's efforts to damage his interest in Ultrapak to avoid having to buy him out under the contractual formula in the Purchase Agreement. The alleged misconduct is analogous to a misrepresentation of Ultrapak's value and of efforts to maintain that value; and to self-dealing. *See Meisel v. Grunberg*, 651 F. Supp. 2d 98, 120 (S.D.N.Y. 2009) (citations omitted); *cf. Estrada v. Dugow*, No. 15 CIV. 3189 (ER), 2016 WL 1298993, at *5 (S.D.N.Y. Mar. 31, 2016) ("Self-dealing also constitutes a breach under the well-established law of fiduciaries.) (citations omitted); *Piller v. Princeton Realty Assocs. LLC*, 104 N.Y.S.3d 344, 350 (N.Y. App. Div. 2019) (claim for breach of fiduciary duty survive dismissal where defendant allegedly caused "plaintiff to be divested of the value of his interest"); *Salm v. Feldstein*, 799

---

[2] New York law applies to Count Two. Under Section 8.5 of the Purchase Agreement, the parties agreed to New York law "for the purposes of any action arising out of or relating to this Agreement." The phrase "arising out of or relating to" is broad enough here to cover an allegation about the transfer of ownership that lies at the heart of the Purchase Agreement. *See Rosehoff Ltd. v. Cataclean Americas LLC*, No. 12-CV-1143A, 2013 WL 2389725, at *8 (W.D.N.Y. May 30, 2013) (interpreting "arising out of" and "in relation to") (citing *Coregis Ins. Co. v. Am. Health Found., Inc.*, 241 F.3d 123, 128 (2d Cir. 2001) (citation omitted)).

N.Y.S.2d 104, 106 (N.Y. App. Div. 2005) (noting that "the alacrity with which the dealership was sold after the plaintiff conveyed his interest in the company to the defendant" sufficed to show misrepresentation of value for summary-judgment purposes). Finally, Khan successfully has pleaded damages caused by the alleged breach of fiduciary duty. "The measure of damages for breach of fiduciary duty is the amount of loss sustained, including lost opportunities for profit on the properties by reason of the faithless fiduciary's conduct." *105 E. Second St. Assocs. v. Bobrow*, 573 N.Y.S.2d 503, 504 (N.Y. App. Div. 1991) (citation omitted). "[T]he calculation of damages in breach of fiduciary duty cases is predicated upon the type of misconduct in which the fiduciary engaged." *Fed. Ins. Co. v. Mertz*, No. 12-CV-1597-NSR-JCM, 2016 WL 164618, at *7 (S.D.N.Y. Jan. 12, 2016) (internal quotation marks and citations omitted). The measure of damages most appropriate for this case can be determined after discovery and after a specific finding of liability at trial. At a minimum, though, Khan has pleaded explicitly that Laninver's faithless conduct cost Ultrapak about $1 million in extra charges, which would have a ripple effect on the value of Khan's ownership interest. (Dkt. No. 29 at 16.) Khan additionally has pleaded in Count Two that Laninver intentionally damaged Ultrapak's value to dodge the mandatory buyout of Khan specified in Section 2.2 of the Purchase Agreement. Laninver is right to point out that Count Two only implies that Section 2.2 would have taken effect absent the alleged faithless conduct. At this very early stage of the litigation, however, the implication is strong enough that Khan should have an opportunity to document his assertions more carefully during discovery.

Under the circumstances, Khan successfully has pleaded Laninver's breach of a fiduciary duty to him that directly caused him damages. Accordingly, the Court recommends denying Laninver's motion with respect to Count Two of the amended complaint.

17

## IV. CONCLUSION

Khan successfully has pleaded a violation of trust that, subject to discovery and trial, plausibly could constitute a breach of fiduciary duty. For all of the foregoing reasons, the Court respectfully recommends granting Laninver's motion to dismiss (Dkt. No. 33) in part to dismiss Counts One and Three of the amended complaint. The Court recommends denying Laninver's motion with respect to Count Two of the amended complaint.

## V. OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below. "Within 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Any objections must be filed electronically with the Clerk of the Court through the CM/ECF system.

"As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point." *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted); *see also Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) ("Where parties receive clear notice of the consequences, failure timely to object to a magistrate's report and recommendation operates as a waiver of further judicial review of the magistrate's decision.") (citation omitted). "We have adopted the rule that failure to object timely to a magistrate judge's report may operate as a waiver of any further judicial review of the decision, as long as the parties receive clear notice of the consequences of their failure to object. The rule is

enforced under our supervisory powers and is a nonjurisdictional waiver provision whose violation we may excuse in the interest of justice." *United States v. Male Juvenile (95-CR-1074)*, 121 F.3d 34, 38–39 (2d Cir. 1997) (internal quotation marks and citations omitted).

"Where a party only raises general objections, a district court need only satisfy itself there is no clear error on the face of the record. Indeed, objections that are merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original papers will not suffice to invoke de novo review. Such objections would reduce the magistrate's work to something akin to a meaningless dress rehearsal." *Owusu v. N.Y. State Ins.*, 655 F. Supp. 2d 308, 312–13 (S.D.N.Y. 2009) (internal quotation and editorial marks and citations omitted).

SO ORDERED.

__/s Hugh B. Scott_____
Hon. Hugh B. Scott
United States Magistrate Judge

DATED: January 9, 2020