```
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
```
_____

KHALID M. KHAN,

                          Plaintiff,      **Report & Recommendation**

     v.                                  18-CV-561-JLS-LGF

LANINVER USA, INC.,

                          Defendant.
_____

## INTRODUCTION

This matter has been referred to the undersigned pursuant to 28 U.S.C. § 636(b). Plaintiff Khalid M. Khan brings this action against Defendant Laninver USA, Inc., alleging claims related to the breakdown of the parties' business relationship. In his first amended complaint, Plaintiff brought claims for breach of contract, breach of fiduciary duty, and contractual indemnification. See Docket # 29 at 21-24. In January 2020, Magistrate Judge Hugh B. Scott issued a Report & Recommendation ("R&R") on Defendant's motion to dismiss, recommending that the breach of contract and contractual indemnification claims be dismissed. Docket # 51. District Judge Sinatra adopted the R&R and gave Plaintiff an opportunity to amend. Docket # 62.

In July 2020, Plaintiff filed his second amended complaint, raising two claims: (1) breach of the implied covenant of good faith and fair dealing, and (2) breach of fiduciary duty. Docket

# 66. Defendant has now filed a partial motion to dismiss as to the first claim. Docket # 67. Plaintiff opposes the motion, Docket # 70, and Defendant has filed its reply. Docket # 74. The matter is therefore fully briefed.

For the reasons that follow, the Court recommends that Defendant's partial motion to dismiss be DENIED.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted).

Courts assess Rule 12(b)(6) motions by "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." Peter F. Gaito Architecture,

LLC v. Simone Dev. Corp., 602 F.3d 57, 61 (2d Cir. 2010) (internal quotation marks and citation omitted). "On a motion to dismiss, the court may consider any written instrument attached to the complaint as an exhibit or any statements or documents incorporated in it by reference." Yak v. Bank Brussels Lambert, 252 F.3d 127, 130 (2d Cir. 2001) (editorial and internal quotation marks and citation omitted). "Simply stated, the question under Rule 12(b)(6) is whether the facts supporting the claims, if established, create legally cognizable theories of recovery." Cole-Hoover v. Shinseki, No. 10-CV-669, 2011 WL 1793256, at *3 (W.D.N.Y. May 9, 2011) (internal quotation marks and citation omitted).

## BACKGROUND

Because the allegations in Plaintiff's second amended complaint largely mirror those contained in the first amended complaint, the Court adopts the relevant facts as laid out in the prior Report and Recommendation. See Khan v. Laninver USA, Inc., No. 18-CV-561, 2020 WL 108424, at *1-4 (W.D.N.Y. Jan. 9, 2020).

According to the second amended complaint, and assumed to be true for purposes of this motion, Plaintiff owned a company called Shaant Industries, Inc., based in Dunkirk, New York. Shaant Industries was "a producer of shrink sleeve product packaging in

the North American shrink sleeve and flexible packaging industry." Docket # 66 at 1.

Defendant "is a holding company with no business operations of its own." Id. at 3. It is wholly owned by Laninver S.H.C. S.L., a Spain-based entity, which is itself wholly owned by Grupo Lantero, a "prominent player in the global packaging industry." Id. Grupo Lantero's holdings include "Emsur," a worldwide group of business entities "dedicated to the manufacture of flexible packaging." Id. One of those entities is Emsur USA LLC, a company based in the United States. Defendant is the manager of Emsur USA LLC. Id. Plaintiff alleges that, during the relevant events, Emsur, Emsur USA LLC, and other Emsur-related entities "acted as agents and/or alter egos" of Defendant. Id. Thus, insofar as they operated in the same industry, Shaant Industries and Defendant (with the related Emsur entities) could be viewed as competitors.

In 2012, Emsur approached Plaintiff to discuss acquiring Shaant Industries to expand its global shrink-sleeve operations into the United States and Canada. Emsur represented that "it possessed a high level of expertise in the manufacture of shrink sleeves and was efficiently producing shrink sleeves in multiple plants in Europe and the Americas." Id. at 4. Emsur also represented "that it was dedicating resources and procuring the personnel and printing presses" for Emsur USA LLC, which would

4

allow that entity to manufacture shrink sleeves for Plaintiff's company efficiently and cost-effectively. Id. With these partnerships, Shaant Industries could "aggressively expand in the United States and Canadian shrink sleeves markets." Id.

The discussions between Plaintiff, Defendant, and Emsur continued for about three years and culminated in two agreements. On March 16, 2015, Plaintiff and Defendant entered a Memorandum of Understanding. Docket # 34-1. In the Memorandum of Understanding, the parties declared their intent to have Shaant Industries reorganize as Ultrapak LLC ("Ultrapak"). Defendant intended to purchase a 51 percent stake in Ultrapak to become its majority owner; Plaintiff would be the only other member of the new LLC and would hold a 49 percent stake. Plaintiff and Defendant agreed that Emsur USA LLC — which was identified as a subsidiary of Defendant — would "support" the new Ultrapak entity. Id. at 2; see also id. at 6-7 (discussing the support Emsur USA LLC would provide to Ultrapak and noting that "a strategic collaborative agreement between Emsur and Ultrapak[] has a high potential to be leveraged to capture a significant market share").

A few months later, on July 8, 2015, Plaintiff and Defendant made their intentions formal when they executed a Membership Interest and Note Purchase Agreement (the "Purchase Agreement"). Docket # 34-2. Under Section 2 of the Purchase Agreement, transfer

5

of ownership would occur in two phases. Section 2.1 describes the first phase, called an Initial Interest: Plaintiff would sell Defendant a 51 percent interest in Ultrapak. Id. at 5. Section 2.2 describes a conditional second phase called the Additional Interest. In essence, if Ultrapak's net revenues for the 12 months ending June 30, 2018 met or exceeded $4.5 million then Defendant was required to buy out Plaintiff's remaining 49 percent ownership stake. The amount of the purchase under Section 2.2 would follow a formula described elsewhere in Section 2 and could run as high as several times the net revenues in question. Id. at 6.

Defendant was not obligated to buy out Plaintiff's stake until several conditions were fulfilled. As is relevant here, the financial performance of Ultrapak must have been definitively calculated. See id. at 10. The Purchase Agreement set forth the method by which performance would be calculated: within sixty days after June 30, 2018, Ultrapak was to "prepare and deliver" to Plaintiff and Defendant a balance sheet with the relevant information. Id. at 7. Defendant then had sixty days to review and perform due diligence to confirm the accuracy of the financial data. The Purchase Agreement also provided a method of resolving disputes over calculations. Id.

The parties closed the first phase of the ownership transfer in 2016. Plaintiff became the Chief Executive Officer of Ultrapak.

Once Plaintiff and Ultrapak began taking steps to expand the business, problems soon emerged. Among other things, Emsur subsidiaries produced poor-quality goods, failed to deliver goods in a timely manner, overcharged Ultrapak, and prioritized their own customers and needs over Ultrapak's. See Docket # 66 at 8-16. Defendant did not act to rectify these problems or assist Ultrapak, but instead "usurped opportunities from Ultrapak for Emsur's benefit and constantly prioritized Emsur's business strategies over those of Ultrapak and to the detriment of Plaintiff." Id. at 9.

In Plaintiff's view, it was not merely that Defendant's business strategies incidentally harmed Ultrapak's operations; rather, Defendant directed the Emsur subsidiaries and made the choices in the manner that it did for the purpose of interfering with Ultrapak's business. As June 30, 2018 approached, Defendant more overtly sought to undermine Ultrapak: it encouraged Ultrapak's employees and customers to leave, it spread information about Ultrapak and Plaintiff among employees in order to sow dissension, and it directed Emsur to impose a credit hold on Ultrapak.

Plaintiff filed the present action in May 2018, one month before Ultrapak's performance was to be calculated.

## DISCUSSION

Defendant moves to dismiss the claim for breach of the implied covenant of good faith and fair dealing on several grounds. The Court examines each argument in turn.

### I. Condition Precedent

Defendant first argues that Plaintiff failed to satisfy a condition precedent to its obligation to pay Plaintiff the bonus payout. Docket # 67-1 at 12-15. Specifically, Section 4.2(c)(i) of the Purchase Agreement requires that Ultrapak's financials be "finally determined in accordance with the provisions of Section 2.6." Docket # 66-1 at 10. Section 2.6, in turn, required Ultrapak to deliver its financial information to Plaintiff and Defendant within sixty days after June 30, 2018; Plaintiff and Defendant then had an opportunity to confirm the financial data. See id. at 7. Defendant asserts that Plaintiff did not tender Ultrapak's financial information within the required timeframe, and therefore he did not satisfy a necessary condition to his payout. See Docket # 74 at 2-4.

The Court is not persuaded. It is well-settled that a party "cannot rely on the failure of another to perform a condition precedent where he has frustrated or prevented the occurrence of the condition." A.H.A. Gen. Constr., Inc. v. N.Y.C. Housing Auth., 699 N.E.2d 368, 374 (N.Y. 1998). In addition, "[w]hen a

defendant's behavior demonstrates that satisfaction of a condition precedent would be futile, the plaintiff is relieved from satisfying that condition." CIBC Bank & Trust Co. (Cayman) Ltd. v. Banco Cent. do Brasil, 886 F. Supp. 1105, 1113 (S.D.N.Y. 1995).

In this case, there are two related, sequential conditions that must be satisfied before Plaintiff earns his additional payout. First, Ultrapak must tender its financial data to Plaintiff and Defendant, who then have an opportunity to audit those financials. Second, once the parties confirm Ultrapak's financials, if Ultrapak had a "Net Turnover" of at least $4.5 million for the year ending on June 30, 2018, Defendant was obliged to purchase Plaintiff's shares in Ultrapak and provide the higher payout. See Docket # 66-1 at 6. Defendant's argument only concerns the first condition.

Defendant is correct that, even if it did attempt to suppress Ultrapak's business performance (which thereby interfered with the fulfillment of the second condition), its alleged misconduct did not wholly prevent Plaintiff from providing Ultrapak's financial information to Defendant (for purposes of fulfilling the first condition). See Docket # 74 at 4 ("Plaintiff has not alleged that [Defendant] has prevented [him] or Ultrapak from providing the [financial information], just that those figures will not provide him an earn out . . . ."); cf. A.H.A. Gen. Constr., 699 N.E.2d at

9

374 (considering whether condition precedent to suit was excused and distinguishing between whether defendant interfered with contract performance and whether the defendant "prevented or hindered" the plaintiff's compliance with pre-suit "notice and reporting requirements").

Nevertheless, while it may have been <u>possible</u> for Plaintiff to comply with the first condition, Plaintiff's allegations make clear that it would have been <u>pointless</u> for him to do so. In the leadup to June 30, 2018, Defendant had "worked to minimize Ultrapak's new and existing business and to increase Ultrapak's expenses" in order to keep Ultrapak's revenues below the $4.5 million threshold. Docket # 66 at 21. Viewing the allegations in the light most favorable to Plaintiff, by summer 2018, Defendant had succeeded in sabotaging Ultrapak's business, <u>see id.</u> at 20, 22, and it knew that Ultrapak would not reach the threshold. <u>See id.</u> at 11, 20 (alleging that in April 2018, Defendant audited Ultrapak's finances and told an Ultrapak employee that Ultrapak "was in serious financial crisis").

Given Defendants' alleged misconduct, it would have served no purpose for Plaintiff to tender Ultrapak's financial information and participate in negotiations with Defendant after June 2018: Defendant had been actively sabotaging Ultrapak's business, and both Plaintiff and Defendant knew that Ultrapak had not surpassed

the threshold for Plaintiff's payout. At that point, a formal tender of Ultrapak's financials followed by a <u>pro forma</u> negotiation would have been a useless gesture. <u>See, e.g.</u>, <u>Concorde Fin. Corp. v. Value Line, Inc.</u>, No. 03-CV-8020, 2004 WL 1687205, at *4 (S.D.N.Y. July 28, 2004) ("A plaintiff should not be required to doggedly pursue a contract that is no longer viable when doing so would, at the very least, cause embarrassment and difficulty for the plaintiff while achieving nothing useful."); <u>Sunshine Steak, Salad & Seafood, Inc. v. W.I.M. Realty</u>, 135 A.D.2d 891, 892 (N.Y. App. Div. 1987) ("[W]here it becomes clear that one party will not live up to a contract, the aggrieved party is relieved from the performance of futile acts or conditions precedent.").

Accordingly, Plaintiff's claim should not be dismissed on that basis.

## II. Sufficiency of Claim

Defendant next argues that Plaintiff's allegations are not cognizable as a claim for breach of the implied covenant. <u>See</u> Docket # 67-1 at 15-20. The Court disagrees.

The parties agree that New York law applies to their dispute. <u>See</u> Docket # 66-1 at 16. "[T]here exists under New York law an implied covenant of good faith and fair dealing, pursuant to which neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive

the fruits of the contract." JPMorgan Chase Bank, N.A. v. IDW Grp., LLC, No. 08-CV-9116, 2009 WL 321222, at *4 (S.D.N.Y. Feb. 9, 2009). "[W]here a party's acts subsequent to performance on the contract so directly destroy the value of the contract for another party that the acts may be presumed to be contrary to the intention of the parties, the implied covenant of good faith may be implicated." Id.

However, the covenant "cannot be construed so broadly as effectively to nullify other express terms of a contract, or to create independent contractual rights." Fillmore East BS Fin. Subsidiary LLC v. Capmark Bank, 552 F. App'x 13, 16 (2d Cir. 2014) (summary order). Consequently, "[i]n order to find a breach of the implied covenant, a party's action must directly violate an obligation that may be presumed to have been intended by the parties." Id. "For a complaint to state a cause of action alleging breach of an implied covenant of good faith and fair dealing, the plaintiff must allege facts which tend to show that the defendant sought to prevent performance of the contract or to withhold its benefits from the plaintiff." Id.

Plaintiff's allegations meet this standard. Under the Purchase Agreement, Plaintiff had a right to receive a bonus payout if Ultrapak's financials passed a certain threshold. By virtue of New York law, that contractual right implied a corresponding

12

obligation on Defendant to avoid "bad faith targeted malevolence" that "frustrate[s] the other party's right to benefit under the agreement." Richbell Info. Servs. v. Jupiter Partners, L.P., 309 A.D.2d 288, 302 (N.Y. App. Div. 2003). Plaintiff sufficiently alleges that Defendant did not adhere to that implied obligation. Among other things, Defendant, with the help of its Emsur sister entities: (1) attempted to sow dissension and fears among Ultrapak's employees, thereby harming Ultrapak's business operations; (2) encouraged Ultrapak customers to move their business to Emsur; (3) sought to persuade an Ultrapak sales agent to slow down new business, and later convinced him to terminate his relationship with Ultrapak and move customer accounts to Emsur; (4) ensured that Ultrapak's orders would not be prioritized and would be manufactured at plants with fewer resources and more quality-control problems; and (5) overcharged Ultrapak for various expenses. Plaintiff alleges that all of these actions were taken for the purpose of preventing Plaintiff from obtaining his bonus payout and were otherwise "undertaken wrongfully, intentionally, and in bad-faith." Docket # 66 at 22.

Accepted as true, these allegations state a claim for breach of the implied covenant. See, e.g., Carvel Corp. v. Diversified Mgmt. Grp., Inc., 930 F.2d 228, 230-31 (2d Cir. 1991) (defendant proffered sufficient evidence to show breach of implied covenant,

13

where plaintiff arbitrarily rejected defendant's plans and made "abrupt and unexplained decisions" to reverse its policies, all for the purpose of frustrating defendant's efforts to perform under distributorship agreement); Warren Prescriptions, Inc. v. Walgreen Co., No. 17-CV-10520, 2017 WL 3334053, at *9-10 (E.D. Mich. Aug. 4, 2017) (viable claim for breach of implied covenant where plaintiffs alleged that defendant ran pharmacies in a "substandard manner" in order to avoid additional payouts); Tagare v. Nynex Network Sys. Co., 921 F. Supp. 1146, 1150 (S.D.N.Y. 1996) (claim for breach of implied covenant survived motion to dismiss, where plaintiff alleged that defendant "breached its covenant of good faith and fair dealing by preventing plaintiff from performing and earning the targeted bonuses"); Richbell, 309 A.D.2d at 302-03 (claim for breach of implied covenant sufficiently alleged where defendant used its "veto power over [an] IPO" to "deprive plaintiffs of the benefits of the joint venture").

Defendant's arguments to the contrary are unconvincing. First, Defendant argues that the claim must fail because it largely concerns the conduct of Emsur, not Defendant, and Emsur is neither a party to this action nor a party to the Purchase Agreement. See Docket # 67-1 at 19-21. Defendant also notes that Plaintiff has not satisfied the "stringent pleading requirements for piercing the corporate veil." Id. at 20.

14

Defendant's argument misses the mark. Plaintiff is not seeking to hold Emsur or its subsidiaries directly liable, nor is he attempting to attribute Emsur's conduct to Defendant on a veil-piercing theory. Instead, Plaintiff seeks to hold Defendant liable on the theory that it used Emsur (and its subsidiaries) as its agents to effectuate its bad-faith scheme to sabotage Ultrapak's business. Cf. Harte v. Ocwen Fin. Corp., No. 13-CV-5410, 2016 WL 1275045, at *4 (E.D.N.Y. Mar. 31, 2016) ("Suing a parent corporation on an agency theory is quite different from attempting to pierce the corporate veil, because, on an agency theory, the claim against the parent is premised on the view that the subsidiary had authority to act, and was in fact acting, on the parent's behalf—that is, in the name of the parent." (internal quotation marks omitted)); Royal Indus. Ltd. v. Kraft Foods, Inc., 926 F. Supp. 407, 413 (S.D.N.Y. 1996) ("[J]ust as one corporation can hire another to act as its agent, a parent can commission its subsidiary to do the same."). Whether Emsur and its subsidiaries are alter egos of Defendant is beside the point; the relevant question is whether they were acting as Defendant's agents.

In that respect, the second amended complaint is sufficient. "Authority is the power of the agent to affect the legal relations of the principal by acts done in accordance with the principal's manifestations of consent to him." Skanga Energy & Marine Ltd. v.

15

Arevenca S.A., 875 F. Supp. 2d 264, 269 (S.D.N.Y. 2012). "[T]o adequately allege an actual agency relationship, a plaintiff need only allege facts sufficient to support a reasonable inference of actual authority, and its pleadings may rely upon facts that would constitute circumstantial evidence of authority." Id.

The second amended complaint alleges that Emsur and its subsidiaries were not disinterested companies who happened to do business with Ultrapak; they were intimately involved with the acquisition. See Docket # 66 at 3-6. The pre-acquisition Memorandum of Understanding states that the purpose of the acquisition would be to "develop the sleeve market business in North America," Docket # 34-1 at 2, specifically for Emsur and its subsidiaries. See id. at 6-7. Although the parties to the acquisition were Plaintiff and Defendant, Defendant represented that Emsur USA LLC was its "subsidiary company" and would "support Ultrapak" after the acquisition. Id. at 2. Plaintiff and Defendant agreed on a business plan whereby Emsur USA LLC would supply and meet Ultrapak's manufacturing needs. Id. at 6-7 (noting that the parties envisioned a "strategic collaborative agreement between Emsur [USA LLC] and Ultrapak").

The parties' business plan does not read as if it was contingent on the undertakings of an unrelated third party; it reads as if Defendant could dictate the support Emsur USA LLC would

16

provide to Ultrapak.  Given that Defendant made representations to that effect, a reasonable inference is that Defendant did in fact have the authority and ability to control Emsur USA LLC's activities.  See also Docket # 66 at 3 (alleging that Defendant is the manager of Emsur USA LLC).

These facts provide an adequate foundation for Plaintiff's other allegations that Emsur (and its subsidiaries) were making their business decisions at the behest of Defendant.  See, e.g., id. at 9 (stating that Defendant diverted business opportunities to Emsur and prioritized Emsur's needs over Ultrapak's); id. at 19-20 (alleging that Defendant directed Emsur USA LLC to siphon employees and business from Ultrapak).  Because Defendant allegedly directed the actions of Emsur and its subsidiaries for the purpose of interfering with Plaintiff's ability to obtain the payout, the claim for breach of the implied covenant is viable.

Second, Defendant notes that that the Purchase Agreement does not preclude it or Emsur from prioritizing Emsur's business interests and does not purport to provide warranties as to Emsur's goods.  See Docket # 67-1 at 16-19.  Therefore, Defendant asserts, the implied covenant cannot apply because it would require the Court to add new terms and new parties to the Purchase Agreement.

Defendant is correct that the implied covenant of good faith and fair dealing cannot be used to "add to the contract a

17

substantive provision not included by the parties." <u>George Town Assocs. S.A. v. Abakan, Inc.</u>, No. 15-CV-3435, 2015 WL 4923040, at *9 (S.D.N.Y. Aug. 18, 2015). More generally, the implied covenant "does not undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's expected benefit," <u>id.</u>, and it is not a freestanding vehicle to challenge a defendant's mismanagement or negligence where no contractual duty exists. <u>See</u> <u>Sec. Plans, Inc. v. CUNA Mut. Ins. Soc.</u>, 769 F.3d 807, 817-19 (2d Cir. 2014) (internal quotation marks omitted); <u>see also</u> <u>id.</u> at 818 ("Negligence in operating a business . . . is insufficient to support a claim under the implied covenant.").

If Plaintiff were merely alleging that Defendant had incidentally interfered with Ultrapak's business interests or had negligently mismanaged Emsur USA LLC, Defendant might have a persuasive argument. Plaintiff alleges more than that, however. He claims that Defendant's actions were for the purpose of interfering with his right to a bonus payout, a right which the Purchase Agreement indisputably confers upon him. Defendant may have been otherwise free to conduct its business activities as it saw fit, but it could not engage in bad faith conduct designed to "frustrate the [Plaintiff's] right to the benefit under the agreement." <u>Richbell</u>, 309 A.D.2d at 302 (plaintiffs' allegations

18

that defendant malevolently exercised its contractual rights "do not create new duties that negate [defendant's] explicit rights under a contract, but rather, seek imposition of an entirely proper duty to eschew this type of bad-faith targeted malevolence in the guise of business dealings"). It remains to be seen whether Plaintiff can substantiate his bad-faith theory, but at this stage he has sufficiently pleaded it to survive a motion to dismiss and proceed to discovery.

In sum, accepting all factual allegations as true and viewing them in the light most favorable to Plaintiff, the Court finds that the Defendant's motion to dismiss the claim for breach of the implied covenant of good faith and fair dealing is not appropriate at this juncture of the litigation.

## CONCLUSION

For the reasons stated above, it is my Report and Recommendation that Defendant's motion to dismiss (Docket # 67) be **DENIED**.

_____
JONATHAN W. FELDMAN
UNITED STATES MAGISTRATE JUDGE

Dated:   Rochester, New York
         March 31, 2021

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with Rule 72(b)(2) of the Federal Rules of Civil Procedure.

The district court will ordinarily refuse to consider on de novo review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. See, e.g., Paterson-Leitch Co., Inc. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** Thomas v. Arn, 474 U.S. 140 (1985); Wesolek v. Canadair Ltd., 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) of the Local Rules of Civil Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72(b) may result in the District Court's refusal to consider the objection.**

SO ORDERED.

_____
Jonathan W. Feldman
United States Magistrate Judge

Dated: March 31, 2021
Rochester, New York